**DONE AND ORDERED** in Chambers at Miami, Florida this 9th of October, 2015.

**E.S.Y., INC., et al., Plaintiffs,**

v.

**SCOTTSDALE INSURANCE COMPANY, Defendant.**

.CASE NO. 15–21349–CIV

United States District Court,
S.D. Florida.

Signed October 14, 2015

Sagi Shaked, Shaked Law Firm, P.A., Aventura, FL, for Plaintiffs.

Kathleen Johnson Maus, Julius Frederick Parker, III, Butler Pappas Weihmuller Katz et al, Tallahassee, FL, for Defendant.

### ORDER

CECILIA M. ALTONAGA, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** came before the Court on Defendant, Scottsdale Insurance Company's ("Defendant['s]") Motion for Final Summary Judgment ("Defendant's Motion") [ECF No. 21], filed August 18, 2015, along with an Amended Statement of Undisputed Facts ... ("Defendant's SUF") [ECF No. 34], filed September 14, 2015. On September 2, 2015, Plaintiffs, E.S.Y., Inc. ("E.S.Y.") and Yariv Shaked ("Shaked") (together, "Plaintiffs"), filed a Second Amended Response ... and Cross Motion for Summary Judgment ("Plaintiffs' Motion") [ECF No. 30], along with a Statement of Undisputed Facts ... ("Plaintiffs' SUF") [ECF No. 31]. Defendant filed a Memorandum in Opposition ... ("Defendant's Response") [ECF No. 35]. Neither party filed a reply brief. The Court has carefully reviewed the parties' written submissions; the Complaint ... ("Complaint") [ECF No. 1–1]; the record; and applicable law.

### I. BACKGROUND

Defendant issued Plaintiffs [1] a commercial general liability insurance policy (the "Policy") providing, among other things, coverage for "advertising injury" liability, including defense of claims with the requisite nexus to "advertising injury." (Def.'s SUF ¶¶ 18–19; Pls.' SUF ¶¶ 11–14). Exist, Inc. ("Exist"), an apparel designer, later filed suit against Plaintiffs in this Dis-

trict in case number 14–62429–CIV–BLOOM (the "Exist Suit"), which has since been administratively closed upon the parties' settlement. (See Def.'s SUF ¶¶ 1, 6; Exist Suit [ECF No. 88]). Plaintiffs contend Defendant failed to fulfill its duty under the Policy to defend them in the Exist Suit. (See generally Compl.; Pls.' Mot.). As the outcome of this case turns on the allegations and claims in the Exist Suit and the terms of the Policy, the Court addresses those topics first.

### A. The Exist Suit

Exist's Second Amended Complaint (the "Exist Complaint") (Exist Suit [ECF No. 29]) was the operative complaint in the Exist Suit at the time Plaintiffs' Complaint in the instant case was filed. (See Def.'s SUF ¶ 2; see also Exist Compl.). The court summarized Exist's allegations as follows:

> According to the [Exist Complaint], [Exist] is a maker, marketer, and seller of garments and uses multiple trademarks and copyrighted designs throughout the United States, including online. [Exist]'s trademarks include the "Exist Shield Mark," federally registered with Registration No. 4,675,022, and registered in Florida with Registration No. T14000000643. See ECF Nos. [29–1] ("For: Shorts; Sweatshirts; T–Shirts; Tank–Tops"); [29–2] ("T–Shirts, Tank Tops, Shorts Sets, Sweatshirts"). See also ECF No. [29–2] at 5 (indicating trademarks are used to identify product with "labels and hang tags"). See also ECF No. [292] at 8–10 (images of clothes with [Exist]'s labels and hang tags). [Exist] also applied for and received a United States Copyright regis-

---

1. The Complaint alleges E.S.Y. does business under the name "Liquid Energy" and Shaked is E.S.Y.'s "president/director/officer" (Compl.1), but neither the Complaint nor the parties' statements of undisputed facts indicate exactly what kind of business E.S.Y. conducts.

tration for its design ("the Exist Shield Design"), with Registration No. VA 1908820. *See* ECF No. [29–3].

[Exist] alleges [Plaintiffs] "began using an identical or substantially similar mark [ (the "Liquid Energy Shield Mark") ] ... in connection with their own competing garments." ECF No. [29] at 6. [Exist] alleges [Plaintiffs] use labels and hang tags "in such a manner that its use causes and is causing actual confusion in the marketplace, or is likely to cause such customer confusion, whereby consumers mistakenly assume that [Plaintiffs'] products offered under [Plaintiffs]' Shield Mark are associated with or sponsored or approved by Exist." *Id.* at 7. [Exist] also alleges [Plaintiffs] "created, sold, manufactured, caused to be manufactured, imported and/or distributed fabric and/or garments bearing labels or hang tangs that are identical or substantially similar to [the] Exist Shield Design to numerous parties in the fashion and apparel business." ECF No. [29] at 8–9. [Exist] provides images showing "sale of infringing goods in this Judicial District." *Id.* at 9. *See also* ECF No. [29–4] at 1–7 (images of clothes with [Plaintiffs]' labels and hang tags).

(Exist Suit [ECF No. 58] 1–2 (alterations added)).

The Exist Complaint asserted seven counts: federal copyright infringement (Count I), federal vicarious and/or contributory copyright infringement (Count II), federal unfair competition (Count III), federal false designation of origin (Count IV), federal trademark infringement (Count V), Florida statutory trademark infringement (Count VI), and Florida common law unfair competition (Count VII). (*See* Exist Compl.). In the Prayer for Relief, Exist requested, *inter alia*, injunctive relief, actual damages, and treble damages. (*See id.* Prayer for Relief ¶¶ 1.a, 5, 6).

Counts I and II were brought under the Copyright Act, 17 U.S.C. section 101 *et seq.* Exist sought damages under Count I on the theory Plaintiffs, by making and selling garments with hang tags and labels bearing the Liquid Energy Shield Mark, infringed Exist's copyright in the Exist Shield Design, which Exist used on its garments' hang tags and labels. (*See* Exist Compl. Count I). Exist sought damages under Count II on the related theories: (1) Plaintiffs were subject to contributory liability because they "knowingly induced, participated in, aided and abetted in and profited from the illegal reproduction and/or subsequent sales of" the infringing garments (*id.* ¶ 47); and (2) Plaintiffs were vicariously liable "because they had the right and ability to supervise the infringing conduct and because they had a direct financial interest in the infringing conduct" (*id.* ¶ 48).

Counts III, IV, and V were brought under the Lanham Act, 15 U.S.C. section 1051 *et seq.* Under Count III, Exist claimed Plaintiffs were liable for "federal unfair competition" on the basis Plaintiffs' use of the Liquid Energy Shield Mark on hang tags and labels was "a false or misleading description of fact as to the origin or sponsorship of [their] goods" and was also a "false association with Exist and Exist goods bearing such Marks." (Exist Compl. ¶ 53 (alteration added; capitalization omitted)). Exist further claimed Plaintiffs' use was "likely to cause confusion, mistake, or deception as to the source of [Plaintiffs]' goods and [was] likely to mislead consumers and retailers that the infringing goods [were] authorized, sponsored, endorsed, licensed by, or affiliated with Exist." (*Id.* ¶ 54 (alterations added; capitalization omitted)).

Under Count IV, Exist sought damages and injunctive relief on the theory Plaintiffs were liable for false designation of

origin. (See id. ¶¶ 62–63). A claim of false designation of origin, like a claim of unfair competition, is brought under Section 43(a) of the Lanham Act, 15 U.S.C. section 1125(a). For Count IV, Exist alleged "[Plaintiffs]' acts ... constitute[d] a false designation of origin, which [wa]s likely to cause confusion, mistake or deception...." (Exist. Compl. ¶ 57 (alterations added)). Exist further alleged Plaintiffs' use of the Liquid Energy Shield Mark "constitute[d] false designation of origin, false or misleading description, and/or false or misleading representation as to the origin or sponsorship of the goods." (Id. ¶ 58 (alteration added)). According to Exist, "[s]uch unauthorized use cause[d], and [wa]s likely to cause, confusion, mistake, or deception of others, as to the affiliation, connection, or association of [Plaintiffs] with Exist, and also cause[d], and [wa]s likely to cause, confusion, mistake, or deception as to the origin, sponsorship, or approval of the goods and services of [Plaintiffs] with those of Exist." (Id. (alterations added; capitalization omitted)).

Count V sought damages and injunctive relief for trademark infringement of a federally registered mark—a violation of Section 32(a) of the Lanham Act, 15 U.S.C. section 1114(1)(a). (See Exist Compl. ¶¶ 68–69). According to Exist, Plaintiffs "used in commerce a reproduction, counterfeit, copy, or colorable imitation of that registered mark [ (i.e., the Exist Shield Mark) ] in connection with the sale, offering for sale, distribution or advertising of goods and services provided by [Plaintiffs]." (Id. ¶ 65 (alterations added)).

The last two counts of the Exist Complaint were brought under Florida law. As to Count VI, Exist sought damages and injunctive relief under Florida Statute section 495.151 for trademark infringement on the basis Plaintiffs infringed Exist's Florida-registered mark. (See Exist Compl. Count VI). In Count VII, Exist asserted a claim of Florida common law unfair competition, alleging Plaintiffs' "operation of a business ... offering for sale and selling garments bearing labels and hang tags with the infringing [Liquid Energy] Shield Mark [wa]s without Exist's authorization." (Id. ¶ 79 (alterations added; capitalization omitted)). According to Exist, Plaintiffs thereby "misappropriat[ed] and trad[ed] upon the goodwill and business reputation represented by the Exist Shield Marks." (Id. ¶ 81 (alterations added; capitalization omitted)).

### B. The Policy

The parties' dispute begins with the Policy's "advertising injury" coverage provision (the "Coverage Provision"), which states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

(Def.'s SUF ¶ 19).[2]

The critical term "advertising injury" is defined in the Policy:

> "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

---

2. The coverage provision further limits coverage to injury "caused by an offense arising out of your business but only if the offense was committed in the 'coverage territory' during the policy period." (Def.'s SUF ¶ 19). The parties raise no dispute related to this limitation.

* * *

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

* * *

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

(*Id.* (alterations added)).

The related term "advertisement" is defined as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters . . . ." (*Id.* (alteration added)).

Two exclusions in the Policy are relevant here. The first is the "Knowing Violation Of Rights Of Another" exclusion (the "Knowing Violation Exclusion"), which excludes from coverage " '[p]ersonal and advertising injury' caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'." (*Id.* (alteration added)).

The other exclusion is the "Infringement Of Copyright, Patent, Trademark Or Trade Secret" exclusion (the "Infringement Exclusion"), which excludes from coverage:

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

(*Id.*).

## C. Procedural History

On January 29, 2015, Defendant refused Plaintiffs coverage, including a legal defense, with respect to the Exist Suit. (*See* Compl. ¶8). Plaintiffs, thus commenced this action in state court, seeking a declaration:[3] (1) the Policy is valid; (2) the Exist Suit is covered under the Coverage Provision; (3) Defendant has a duty to defend Plaintiffs in the Exist Suit; (4) Defendant must indemnify Plaintiffs if they are found liable in the Exist Suit; and (5) Defendant must pay attorney's fees and costs in the Exist Suit incurred by Plaintiffs as a result of Defendant's refusal of coverage. (*See id.* Counts I, II). Plaintiffs also seek attorney's fees and costs incurred in bringing this action. (*See id.*). After filing its Answer . . . [ECF No. 1–2] in state court, Defendant filed a Notice of Removal[4] [ECF No. 1], invoking the Court's diversity jurisdiction. (*See id.* ¶2). The Court agreed it has jurisdiction over this case and denied Plaintiffs' motion to remand on June 30, 2015. (*See* Order [ECF No. 19]).

---

3. The Complaint does not indicate the statute pursuant to which Plaintiffs seek relief, but given the Complaint was filed in state court, presumably Plaintiffs sought relief under the Florida Declaratory Judgment Act. Because the case was removed to federal court based on diversity jurisdiction, however, the Court applies the federal Declaratory Judgment Act, 28 U.S.C. section 2201. *See Incredible Invs., LLC v. Fernandez–Rundle,* 984 F.Supp.2d 1318, 1323–24 (S.D.Fla.2013); *Garden–Aire Vill. S. Condo. Ass'n Inc. v. QBE Ins. Corp.,* 774 F.Supp.2d 1224, 1227 (S.D.Fla.2011).

4. Defendant's Notice of Removal is titled "DEFENDANT, AXIS SURPLUS INSURANCE COMPANY'S NOTICE OF REMOVAL."

The parties now cross-move for summary judgment, agreeing judgment is proper as a matter of law because no material facts are disputed. (*See* Def.'s Mot. 1; Pls.' Mot. 1).

## II. LEGAL STANDARD

Summary judgment shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997), and "must resolve all reasonable doubts about the facts in favor of the nonmovant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.,* 894 F.2d 1555, 1558 (11th Cir.1990). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff,* 274 Fed.Appx. 839, 841 (11th Cir.2008) (quoting *Allen v. Tyson Foods Inc.,* 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Channa Imps., Inc. v. Hybur, Ltd.,* No. 07–21516–CIV, 2008 WL 2914977, at *2 (S.D.Fla. July 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (alterations and internal quotation marks omitted)). "[T]he plain language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548 (alterations and internal quotation marks omitted)).

## III. ANALYSIS

Defendant argues it had no duty to defend Plaintiffs because the Exist Complaint did not allege Plaintiffs were liable to Exist for "personal and advertising injury," as defined in the Policy. (*See* Def.'s Mot. 4–5). Defendant also avers, even if Exist did allege "personal and advertising injury," the Infringement Exclusion and the Knowing Violation Exclusion preclude coverage. (*See id.* 6–8). Given the foregoing, Defendant contends it is entitled to summary judgment. (*See generally id.*).

Plaintiffs insist they, rather than Defendant, are entitled to summary judgment. (*See generally* Pls.' Mot.). According to Plaintiffs, given the Court must resolve any doubt about Defendant's duty to defend or indemnify in favor of Plaintiffs, each of Defendant's arguments fails. (*See id.* 2–5, 7–9, 10–12). Additionally, Plaintiffs argue the allegations in the Exist Complaint trigger two additional sub-provisions in the definition of "personal and advertising injury." (*See id.* 5–7, 9–10). In response, Defendant argues those coverage provisions likewise do not entitle

Plaintiffs to the relief they seek. (*See* Def.'s Resp. 5–9).

## A. Insurance Policy Construction
### 1. General Principles

As the Court has jurisdiction owing to diversity of citizenship, and the parties agree Florida law applies to the Policy, the Court applies Florida law. *See Rolyn Cos., Inc. v. R & J Sales of Tex., Inc.,* 671 F.Supp.2d 1314, 1322 (S.D.Fla. 2009) (citation omitted). "Under Florida law, an insurance policy is treated like a contract, and therefore ordinary contract principles govern the interpretation and construction of such a policy. As with all contracts, the interpretation of an insurance contract is a question of law to be determined by the court." *Vozzcom, Inc. v. Beazley Ins. Co., Inc.,* 666 F.Supp.2d 1321, 1328 (S.D.Fla.2009) (internal quotation marks and citations omitted). "[I]nsurance contracts must be construed in accordance with the plain language of the policy." *Id.* (alteration added; internal quotation marks and citation omitted). Further, the insurance policy is read as a whole, with the Court endeavoring to give each provision its full meaning and operative effect. *See id.* at 1329 (citations omitted).

If the policy language "is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered ambiguous." *Id.* (internal quotation marks, citations, and alteration omitted). In that case, the "ambiguous provision is construed in favor of the insured and strictly against the drafter." *Id.* (internal quotation marks and citations omitted). And where interpretation "involve[s] exclusions to insurance contracts, the rule is even clearer in favor of strict construction against the insurer: exclusionary provisions which are ambiguous or otherwise susceptible to more than one

meaning must be construed in favor of the insured." *Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 412 F.3d 1224, 1228 (11th Cir.2005) (quoting *State Farm Mut. Auto. Ins. Co. v. Pridgen,* 498 So.2d 1245, 1248 (Fla.1986)). Nevertheless, the Court may not "rewrite a contract of insurance[,] extending the coverage afforded beyond that plainly set forth in the insurance contract." *AAA Life Ins. Co. v. Nicolas,* 603 So.2d 622, 623 (Fla. 3d DCA 1992) (alteration added; citation omitted).

When the parties dispute coverage and exclusions under a policy, a burden-shifting framework applies. "A person seeking to recover on an insurance policy has the burden of proving a loss from causes within the terms of the policy[,] and if such proof of loss is made within the contract of insurance, the burden is on the insurer to establish that the loss arose from a cause that is excepted from the policy." *U.S. Liab. Ins. Co. v. Bove,* 347 So.2d 678, 680 (Fla. 3d DCA 1977) (alteration added; citations omitted). Thus, Defendant, as the insurer, has the burden to establish a policy exclusion applies. *See CDC Builders, Inc. v. Amerisure Mut. Ins. Co.,* No. 10–21678–CIV, 2011 WL 4454937, at *11 (S.D.Fla. Aug. 16, 2011) (citations omitted). Once the insurer establishes an exclusion's applicability, the insured must prove an exception to the exclusion. *See id.* (citation omitted).

### 2. Duty to Defend

Under Florida law, an insurer's duty to defend is triggered if the allegations of a complaint brought against the insured fall within the scope of the insurer's duty. *See Higgins v. State Farm Fire & Cas. Co.,* 894 So.2d 5, 9–10 (Fla. 2004) (citations omitted). A court looks no further than to the terms of the insurance policy and the allegations of the complaint

brought against the insured to determine if the duty to defend is triggered. *See id.* "If the complaint alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." *MJCM, Inc. v. Hartford Cas. Ins. Co.,* No. 8:09–CV–2275–T–17TBM, 2010 WL 1949585, at *4 (M.D.Fla. May 14, 2010) (citation omitted).

 As in any other insurance policy interpretation context, "[d]oubts as to whether a duty to defend exists are resolved in favor of the insured, and exclusionary clauses in insurance contracts are to be construed liberally in favor of the insured." *Id.* at *5 (alteration added; citation omitted). Likewise, the underlying complaint is not read strictly: "an insurer must defend a lawsuit against its insured if the underlying complaint, when fairly read, alleges facts which create potential coverage under [the] policy." *McCreary v. Fla. Res. Prop. & Cas. Joint Underwriting Ass'n,* 758 So.2d 692, 695 (Fla. 4th DCA 1999) (alteration added; citation omitted); *see also Essex Ins. Co. v. Big Top of Tampa, Inc.,* 53 So.3d 1220, 1223 (Fla. 2d DCA 2011) ("A liability insurer has no duty to defend a suit where the complaint on its face alleges facts which fail to bring the case within the coverage of the policy." (citation omitted)).

 With respect to indemnification, because the duty to defend is broader than the duty to indemnify, where there is no duty to defend, there is no duty to indemnify. *See Farrer v. U.S. Fid. & Guar. Co.,* 809 So.2d 85, 88 (Fla. 4th DCA 2002) (citation omitted). Further, in contrast to the duty to defend, "the duty to indemnify is determined by the facts adduced at trial or during discovery." *Id.* (citation omitted).

### B. Advertising Injury

As indicated, the Coverage Provision of the Policy states Defendant "will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." (Def.'s SUF ¶ 19). The Policy also defines the term "advertising injury." (*Id.*). The Eleventh Circuit interpreted a similar coverage provision under Florida law by applying the following analytical framework: first, pursuant to the plain language of the definition of "advertising injury," the insured must prove an alleged violation "gave rise to an 'advertising injury;'" and second, if the "advertising injury" definition is satisfied, then, pursuant to the plain language of the "advertising injury" coverage provision, the insured must also prove "there exists a 'causal connection' between that injury and the 'advertising activity' undertaken by" the insured. *Hyman v. Nationwide Mut. Fire Ins. Co.,* 304 F.3d 1179, 1186–87 (11th Cir.2002) (citation omitted).[5] In addition, because the Coverage Provision refers expressly to "damages," Plaintiffs must show Exist sought damages—as opposed to other kinds of relief—for the particular advertising injuries as to which a causal connection is established. *See MJCM,* 2010 WL 1949585, at *6–7.

Plaintiffs argue the allegations of the Exist Complaint satisfy (a) three different sub-provisions of the Policy's definition of "advertising injury" and (b) the other requirements of the Coverage Provision, thereby triggering Defendant's duty to defend. (*See* Pls.' Mot. 3–10).

---

5. A third step of the analysis is whether the insured "was engaged in 'advertising activity' during the policy period when the alleged 'advertising injury' occurred." *Hyman,* 304

F.3d at 1187 n. 7 (internal quotation marks and citations omitted). The parties do not dispute this temporal aspect of the analysis.

## 1. Sub–Provision D

Sub–Provision D includes within the scope of "personal and advertising injury" the offense of "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (Def.'s SUF ¶ 19 (alteration added)). Plaintiffs argue the Exist Complaint alleged slander and libel in addition to disparagement. (*See* Pls.' Mot. 5–7). Plaintiffs cite no legal authority developing the slander and libel argument (*see id.* 5–6), and as it is Plaintiffs' burden to establish coverage, the Court declines to address this unsupported argument.

■ Plaintiffs make more of an effort to advance their disparagement argument, citing three cases in which courts have defined the term "disparage" in various contexts. (*See id.* 6–7 (citing cases)). More on point here, however, the Seventh Circuit in *Acme United Corp. v. St. Paul Fire & Marine Insurance Co.*, 214 Fed. Appx. 596 (7th Cir.2007), found use of the term "disparages" in an insurance policy's "advertising injury" definition to be clear and unambiguous:

> The operative term here is "disparage." Disparage means "to discredit or bring reproach upon by comparing with something inferior." *Webster's Third New International Dictionary (unabridged)* 653 (1981); *see also Black's Law Dictionary* 483 (7th ed.1999) (defining disparage as "[t]o dishonor (something or someone) by comparison" or "[t]o unjustly discredit or detract from the reputation of (another's property, product, or business)"). Further, as we have noted in previous cases, "disparagement [could] result[ ] from false comparisons" between products in which the comparison dishonors the product being compared. *See, e.g., Skylink Techs., Inc. v. Assurance Co. of Am.*, 400 F.3d 982, 985

(7th Cir.2005) (citing *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir.1988)).

*Id.* at 599 (alterations in original). Thus, the crux of disparagement is a comparison suggesting another brand is inferior.

The Eleventh Circuit in *Vector Products, Inc. v. Hartford Fire Insurance Co.*, 397 F.3d 1316 (11th Cir.2005), applied Florida law to find insurance coverage under a similar "disparagement" provision. There, the underlying complaint as to which the insured sought coverage alleged the insured's advertisements made (a) false and deceptive statements of fact and (b) "specific examples of comparisons" suggesting the insured's product was superior to the "leading brand" (*i.e.*, superior to the plaintiff-competitor's product). *Id.* at 1318. Although the insurance policy was ambiguous as to whether the advertisement had to refer to the competitor's name specifically (as opposed to merely calling it the "leading brand"), the court resolved that ambiguity in favor of the insured, finding the underlying complaint alleged disparagement. *See id.* at 1319.

In so finding, the court explained it would not have been sufficient if the insurer had "merely touted its own product;" the underlying complaint alleged the insurer compared itself to its competitor in order to dishonor or detract from the reputation of the competitor. *Id.* (citations omitted); *see also Acme United Corp.*, 214 Fed.Appx. at 600 ("These allegations clearly alleged that Acme's advertisements drew a comparison between its products and stainless steel products and asserted that Acme's products were superior because they contain titanium."); *Foliar Nutrients, Inc. v. Nationwide Agribusiness Ins. Co.*, No. 1:14–CV–75 (WLS), 133 F.Supp.3d 1372, 1382, 2015 WL 5595523, at *7 (M.D.Ga. Sept. 21, 2015) ("When Foliar reached out to PFS' customers to both

undermine PFS' product and discourage PFS' customers, under threats of expensive and time-consuming litigation, from engaging in future business with PFS, this arguably amounted to oral disparagement of PFS' goods, products, or services.").

Here, while the Liquid Energy Shield Mark and Plaintiffs' hang tags allegedly look like the Exist Shield Mark and Exist's hang tags, Plaintiffs' conduct was not alleged to make any express comparison to Exist. To the extent the visual similarity between the marks and tags can be construed as Plaintiffs' implicit reference to Exist, nothing about that reference was alleged to dishonor or denigrate Exist. Exist may not have liked that Plaintiffs allegedly copied them, but, at least under Exist's allegations, imitation is not disparagement as there was no comparison suggesting Exist's brand was inferior to Plaintiffs'. *See Vector Products,* 397 F.3d at 1318; *Acme United Corp.,* 214 Fed.Appx. at 599.

Moreover, while Exist alleged it suffered harm to its reputation by being associated with Plaintiffs (*see* Pls.' Mot. 6), that allegation merely implied Exist believed its brand was superior to Plaintiffs'. For disparagement to be alleged, Plaintiffs' alleged misconduct must have suggested Plaintiffs' brand was superior to Exist's. There is thus no coverage here based on a "publication ... that ... disparages a person's or organization's goods, products or services." While the Liquid Energy Shield Mark and Plaintiffs' hang tags allegedly confused customers and infringed the Exist Shield Mark, Plaintiffs' alleged misconduct did not disparage Exist.

### 2. Sub–Provisions F and G

Sub–Provision F brings within the scope of "personal and advertising injury" "[t]he use of another's advertising idea in your 'advertisement,'" whereas Sub–Provision G includes "[i]nfringing upon another's

copyright, trade dress or slogan in your 'advertisement.'" (Def.'s SUF ¶ 19 (alterations added)). Because coverage under both sub-provisions turns in part on whether Plaintiffs show the allegations of the Exist Complaint satisfy the term "your 'advertisement,'" the Court addresses this issue before examining the sub-provisions' other requirements.

*"Your 'Advertisement'"*

■ No party disputes the "your" in the phrase "your 'advertisement'" refers to Plaintiffs. Disputed, however, is Plaintiffs' contention the "[h]ang tags are a form of printed advertisement." (Pls.' Mot. 4 (alteration added)). According to Defendant, the hang tags are part of the garments themselves and therefore cannot constitute advertisements. (*See* Def.'s Mot. 5).

■ The Policy defines "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." (Def.'s SUF ¶ 19). While broad, this definition of "advertisement" nevertheless has its limitations. A company's merely informational notice to the public is not an "advertisement." *See Trailer Bridge, Inc. v. Ill. Nat'l Ins. Co.,* 657 F.3d 1135, 1143 (11th Cir.2011) (finding a news article containing quotations from an interview with the insured's CEO was not an advertisement because its purpose was simply informational). A notice that is part of the product itself arguably is not an "advertisement" either. (*See* Def.'s Mot. 5 (citing *Bear Wolf, Inc. v. Hartford Ins. Co. of Southeast,* 819 So.2d 818 (Fla. 4th DCA 2002); *Farmington Cas. Co. v. Cyberlogic Tech., Inc.,* 996 F.Supp. 695 (E.D.Mich. 1998))).

Here, on a fair reading of the Exist Complaint, Plaintiffs' hang tags, as their

name implies, were attached to Plaintiffs' garments but were not part of the garments themselves—they hung off the garments. (*See* Exist Compl. ¶¶ 29–37). And while the hang tags provided information—at a minimum, identifying the "Liquid Energy" brand—the hang tags' special design presumably had the additional function of attracting consumers to the garments themselves and to the brand more generally. If the hang tags' only purpose was to provide information, they would not need such a particular aesthetic.

By way of contrast, as one knows from common experience, many products do not have fanciful hang tags and instead have, for example, a plain white tag tucked away inside them or, even more basically, a small price tag sticker stuck on the base of the product or on some other area the consumer does not readily notice. These types of labels, which likewise are not part of the products themselves, are hidden from the consumer's eye lest they detract from the product's appeal. The hang tags here presumably did the opposite—they attracted the consumer. Defendant argues the Exist Complaint had no allegations the hang tags were used to attract customers or were sufficiently exposed to the public. (*See* Def.'s Mot. 5). Fairly read, however, the Exist Complaint made those allegations. (*See* Exist. Compl. ¶¶ 23, 32).

■ Of course, the hang tags were not detached from the product in the way a billboard or magazine advertisement is, but the broad definition of "advertisement"

in the Policy governs. If the hang tags did not clearly fit within this category, the definition at least is ambiguous with respect to the question of the hang tags. Under Florida law, such ambiguities are resolved in favor of coverage.[6] Thus, on a fair reading of the Complaint and a liberal interpretation of this ambiguous Policy term, the hang tags were advertisements.[7]

### Sub–Provision F

■ Sub–Provision F brings within the scope of "personal and advertising injury" "[t]he use of another's advertising idea in your 'advertisement.'" (Def.'s SUF ¶ 19 (alteration added)). Because the Exist Complaint satisfies the term "your 'advertisement,'" the question remains whether the Exist Complaint alleges Plaintiffs "use[d] another's advertising idea." No party disputes "another" refers to Exist, and the plain, broad word "use" is not disputed either. The parties' arguments focus instead on the phrase "advertising idea." According to Plaintiffs, Exist's use of hang tags is an "advertising idea" and Exist alleged Plaintiffs' hang tags improperly used Exist's advertising idea. (*See* Pls.' Mot. 9–10).

■ The Policy does not define "advertising idea." "Yet, the Eleventh Circuit, applying Florida law, has construed the term to mean 'any idea or concept related to the promotion of a product to the public.'" *Trailer Bridge*, 657 F.3d at 1143 (quoting *Hyman*, 304 F.3d at 1188). "Put another way, '[a]n advertising idea is a

---

6. Defendant could have drafted an exclusion removing the hang tags from the definition of "advertisement," *see, e.g., Superformance Int'l, Inc. v. Hartford Cas. Ins. Co.*, 332 F.3d 215, 220 (4th Cir.2003) (noting policy excluded from the definition of "advertisement" "the design, printed material, information or images contained in, on or upon the packaging or labeling of any goods or products"), but Defendant did not do so.

7. The parties also disagree whether scattered uses of the words "advertising" and "marketing" in the Exist Complaint are sufficient to satisfy the term "advertisement." (*See* Def.'s Mot. 4–5; Pls.' Mot. 7–8; Def.'s Resp. 5–7). The Court declines to reach this issue given its finding the hang tags are advertisements.

concept about the *manner* a product is promoted to the public.'" *Trailer Bridge*, 657 F.3d at 1143 (emphasis and alteration in original) (quoting *Gemini Ins. Co. v. The Andy Boyd Co.*, Civil Action No. H–05–1861, 2006 WL 1195639, at *2 (S.D.Tex. May 3, 2006) (citing *Hyman*, 304 F.3d at 1188)). For substantially the same reasons a hang tag is an advertisement, it is also an advertising idea. And as the Exist Complaint alleged Plaintiffs' hang tags improperly copied Exist's hang tags (*see* Exist Compl. ¶¶ 29–37), the Exist Complaint alleges "[t]he use of another's advertising idea in your 'advertisement.'"

Plaintiffs also argue a product's trade dress is an "advertising idea" and Exist's hang tags constitute trade dress. (*See* Pls.' Mot. 9–10). Defendant does not object, and Plaintiffs are correct the Exist Complaint is fairly read to allege hang tags are trade dress. *See Hyman*, 304 F.3d at 1189 ("Because trade dress may encompass marketing or packaging designed to draw attention to a product, it can constitute an 'advertising idea' ...." (alteration added; citation omitted)). The Exist Complaint therefore alleges the "use of another's advertising idea in your 'advertisement'" for this reason as well.

### Sub–Provision G

■ Sub–Provision G includes "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement'" as a cognizable offense within the definition of "personal and advertising injury." (Def.'s SUF ¶ 19 (alteration added)). There is no question the Exist Complaint asserts a claim of copyright infringement, and Defendant does not specifically contest Plaintiffs' argument the Exist Complaint states a claim for trade dress infringement (*see* Pls.' Mot. 8–9). In any event, Plaintiffs are correct Counts III and IV may be interpreted as asserting claims of trade dress infringement, given Lanham Act claims of "unfair competition" and "false designation of origin" may be interpreted, especially when fairly read in favor of coverage, as asserting claims of trade dress infringement. *See Hyman*, 304 F.3d at 1186–87 & n. 6 (finding unfair competition claim brought under Section 43(a) of the Lanham Act could be construed as either a trade dress infringement claim or false designation of origin claim); *see also Jones v. Fla. Ins. Guar. Ass'n*, 908 So.2d 435, 442–43 (Fla. 2005) ("It is well settled that an insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage." (citations omitted)). The allegations of the Exist Complaint satisfy the elements of Sub–Provision G because the Exist Complaint clearly claims copyright infringement and can be fairly read to support a claim for trade dress infringement. (*See* Exist Compl. ¶¶ 29–37, Counts III, IV).

### C. The Coverage Provision

#### 1. Causal Connection

■ Similar to the definition in *Hyman*, the "advertising injury" definition here states advertising injury "means injury ... *arising out of* one or more of the following offenses...." (Def.'s SUF ¶ 19 (emphasis and alterations added)). By showing the allegations of the Exist Complaint satisfy the elements of Sub–Provisions F and G, Plaintiffs demonstrate the alleged violations "gave rise to an advertising injury." *Hyman*, 304 F.3d at 1186–87 (citation omitted).

The Coverage Provision, however, requires more than just an "advertising injury": like the provision in *Hyman*, it also requires "a causal connection between that injury and the advertising activity undertaken by" Plaintiffs. *Id.* Specifically, the provision states Defendant "will pay those sums that the insured becomes legally obli-

gated to pay as damages *because of* 'personal and advertising injury' to which this insurance applies." (Def.'s SUF ¶ 19 (emphasis added)). Plaintiffs therefore must show "the injury for which coverage is sought [is allegedly] caused by the advertising itself." *Hyman,* 304 F.3d at 1191–92 (alteration added; internal quotation marks and citations omitted).

■ As Defendant notes (*see* Def.'s Mot. 5), and as the Eleventh Circuit explained, "[s]imply selling an infringing product is not sufficient to satisfy the causal connection requirement." *Hyman,* 304 F.3d at 1192 (alteration added; citation omitted). Rather, the alleged misconduct "[must] be committed in an advertisement." *Id.* (alteration in original; internal quotation marks and citations omitted).

Plaintiffs have shown the Exist Complaint satisfies the causation requirement for the same reason that requirement was satisfied in *Hyman* : Exist claimed Plaintiffs' copying of Exist's hang tags caused harm to Exist by creating confusion among Exist's customers as to Exist's hang tags and Plaintiffs'. (*See* Exist Compl. ¶¶ 29–37); *see also Hyman,* 304 F.3d at 1194 ("Double R's publication of advertisements featuring artwork similar to the artwork in Inter–Global's ads and promoting products substantially similar to Inter–Global's products designated by similar model numbers to Inter–Global's model numbers [are] sufficient to create a nexus between trade dress infringement and advertising." (alteration added)). The causation requirement is satisfied for the additional reason the copyright infringement claim is premised not only on the sale of products bearing the Liquid Energy Shield Mark, which infringes the allegedly copyright-protected Exist Shield Design, but also on the particular display of the Liquid Energy Shield Mark on Plaintiffs' hang tags (*i.e.,* Plaintiffs' advertisements). (*See* Exist Compl. ¶¶ 29–37, Count I).

### 2. Damages

■ The Coverage Provision imposes one last requirement: Exist must have sought damages for the particular advertising injuries as to which the causal connection is satisfied. The Policy specifically states Defendant "will *pay those sums* that the insured becomes legally obligated to pay *as damages* .... We will have the right and duty to defend the insured against any 'suit' seeking those *damages.*" (Def.'s SUF ¶ 19 (emphasis and alterations added)). Defendant is thus correct injunctive relief is not adequate. (*See* Def.'s Mot. 5 (citing *MJCM,* 2010 WL 1949585, at *6–7 (finding insurer had no duty to defend under a policy, like the Policy in this case, which imposed a duty to defend only when damages were sought against the insured for advertising injury, because the underlying suit brought against the insured sought only injunctive relief))).

Defendant analogizes this case to *Trailer Bridge* (*see* Def.'s Resp. 7–8), in which the insurance policy required the insurer "to pay any sums that [the insured] became legally obligated to pay as damages because of 'personal and advertising injury' and to defend [the insured] against any suit seeking such damages." 657 F.3d at 1137 (alterations added). As in the present case, the Eleventh Circuit in *Trailer Bridge* addressed the question of whether, under Florida law, the insurer had a duty to defend the insured in an underlying suit on the basis the allegations in the underlying suit alleged advertising injury. *See id.* at 1138. The court held the insurer had no duty to defend because the underlying suit was an antitrust suit seeking antitrust damages, not damages incurred because of advertising injury. *See id.* at 1139. In so holding, the court rejected the insured's "convoluted argument" that, because the underlying complaint alleged the insured's CEO made certain statements in an inter-

view in a newsletter in furtherance of a price-fixing scheme, the interview was an advertisement, and thus the underlying suit sought damages based on an advertising injury. *See id.* at 1139, 1143. The argument was far too tenuous.

Plaintiffs' argument here is not so tenuous, and indeed, it prevails. (*See* Pls.' Mot. 4, 11). First, Plaintiffs' use of the hang tags fairly provides the basis of a claim for trade dress infringement under Counts III and IV, and those counts seek damages. Count IV explicitly requests damages (*see* Exist Compl. ¶ 62), and while Count III does not expressly indicate the type of relief sought, the Prayer for Relief makes both counts clear enough on this issue, at least under a fair reading: Exist sought actual damages pursuant to 15 U.S.C. section 1117—the provision containing the remedies for violations of Section 43(a) of the Lanham Act, *i.e.*, the section under which Counts III and IV are asserted. (*See id.* Prayer for Relief ¶ 6).

Second, as explained, Exist's copyright infringement claim has the requisite causal connection to advertising injury, and Exist sought damages for that claim. (*See id.* ¶¶ 42–43, 45). Plaintiffs have shown Exist sought damages for the particular advertising injuries as to which the causal connections are established, and therefore Plaintiffs have satisfied the requirements of the Coverage Provision.

### D. Exclusions

Because Plaintiffs prove coverage under the Policy, the burden shifts to Defendant to show an exclusion bars coverage. *See Bove*, 347 So.2d at 680. Defendant does not meet its burden.

#### 1. The Infringement Exclusion

■ Defendant argues the Infringement Exclusion precludes coverage. (*See* Def.'s Mot. 6–7). The first sentence of the Infringement Exclusion denies coverage for "advertising injury" "arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights." (Def.'s SUF ¶ 19). While this sentence arguably would exclude coverage here, the exclusion has a carve-out that significantly limits the first sentence: "this exclusion does not apply to infringement, in your 'advertisement', of copyright, trade dress or slogan." (*Id.*). As explained in the foregoing discussion of Sub–Provision G, the Exist Complaint fairly alleges copyright and trade dress infringement in Plaintiffs' advertisements; thus, the Infringement Exclusion does not bar coverage.

Defendant urges the Court to find the exclusion applies for the same reason the court excluded coverage in *Power Corp. v. Amerisure Insurance Co.*, No. 2:12–cv–192–FtM–29DNF, 2013 WL 4523490 (M.D.Fla. Aug. 26, 2013). (*See* Def.'s Mot. 6). In that case, the insured established "advertising injury" coverage based on allegations it infringed a trademark in its advertisements. *See Power Corp.*, 2013 WL 4523490 at *4–5. The insured then argued an infringement exclusion similar to the one in the instant case did not bar coverage because the underlying complaint asserted a claim of Lanham Act false advertising in addition to a Lanham Act trademark infringement claim. *See id.* at *5–6. The court rejected that argument, finding the false advertising claim was "grounded on the alleged improper use of a trademark," and so " 'arises from' trademark infringement," thereby triggering the exclusion. *Id.* at *6.

The Court will not follow *Power Corp.* because it is factually distinguishable in a critical respect. There, although the insured established advertising injury, it did so on the basis the alleged infringements happened to be presented in advertisements. *See id.* at *4–5. For that reason, among others, the court also found no

claim of trade dress infringement could be discerned. *See id.* at *6–7. Here, while the alleged infringements happened to take place on hang tags, the hang tags are not just collateral facts—upon a fair reading of the Exist Complaint, they also independently form the basis for a claim of trade dress infringement.

## 2. The Knowing Violation Exclusion

Defendant argues the Knowing Violation Exclusion also applies. (*See* Def.'s Mot. 7–8). That exclusion bars coverage for " '[p]ersonal or advertising injury' caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'." (Def.'s SUF ¶ 19 (alteration added)). The Eleventh Circuit in *Vector Products* addressed a similar exclusion in the context of the Lanham Act. There, the insured claimed the insurer had a duty to defend it in an underlying suit alleging false advertising in violation of Section 43(a) of the Lanham Act as well as state law unfair competition and deceptive trade practices law. *See Vector Prods.*, 397 F.3d at 1317–18. The insurer denied coverage, stating, "[b]ecause an allegation of willfulness and knowledge of falsity was incorporated into each count of the [underlying] complaint," it had no duty to defend "based on the exclusions [in the policy] for intent to injure and knowledge of falsity." *Id.* at 1319 (alterations added). In response, the insured contended the exclusion did not preclude coverage because the plaintiff in the underlying suit could recover damages on its Lanham Act claims without proving willfulness or knowledge of falsity, which it pleaded in an attempt to obtain treble damages in addition to actual damages. *See id.* The parties in the instant case make essentially the same arguments. (*See* Def.'s Mot. 7–8; Pls.' Mot. 11–12).

The Lanham Act did indeed allow the underlying plaintiff in *Vector Products* to seek actual and treble damages in the manner the insured described, *see* 397 F.3d at 1320 n. 2 (citation omitted), but after surveying relevant Florida case law and Eleventh Circuit decisions, the court certified the issue to the Florida Supreme Court, as there was no Florida case law controlling "the fact pattern here where a cause of action was pleaded so that policy exclusions for intent to injure and knowledge of falsity appear to apply, even though the law governing that cause of action makes it a strict liability offense." *Id.* at 1320–21. Before the Florida Supreme Court rendered a decision, however, the parties reached a settlement, leaving the case settled but Florida law unsettled. *See Orlando Nightclub Enterprises, Inc. v. James River Ins. Co.*, No. 6:07–cv–1121–Orl–19KRS, 2007 WL 4247875, at *7 (M.D.Fla. Nov. 30, 2007) (explaining the procedural history of *Vector Products* ) (citation omitted).

The instant case presents the Court with a fact pattern substantially similar to that in *Vector Products* : an underlying suit alleging Lanham Act, Copyright Act, and related state law claims, and an insurance policy exclusion based on the insured's alleged knowledge its actions would violate the underlying plaintiff's rights and would inflict advertising injury. Furthermore, the Exist Complaint alleged "intentional, malicious, willful and wanton" misconduct (Exist Compl. ¶ 25), as well as knowing violations of Exist's rights (*see id.* ¶ 34). Those allegations are incorporated into each count (*see id.* ¶¶ 38, 46, 52, 56, 64, 71, 78), and also reiterated in the counts (*see id.* ¶¶ 45, 51, 60, 67, 74). Finally, the Exist Complaint sought actual and treble damages. (*See id.* Prayer for Relief ¶¶ 5, 6).

At least two other federal courts in Florida have addressed this general issue since the Eleventh Circuit's decision in *Vector Products*, but the courts reached outcomes

arguably in tension with each other. Plaintiffs rely on one of those cases, and Defendant relies on the other.

In the case Plaintiffs cite, *Orlando Nightclub*, the insured sought to enforce the insurer's duty to defend it in an underlying lawsuit asserting claims of, among other things, trademark infringement and unfair competition under the Lanham Act and Florida common law unfair competition. *See* 2007 WL 4247875, at *1. The knowing violation exclusion in that case had the same language as the Knowing Violation Exclusion here. *See id.* at *2. Also as in this case, the plaintiff in the underlying suit sought actual damages for its Lanham Act claims but additionally sought treble damages on the allegation the insured acted with intent and knowledge—an allegation incorporated into every count of the complaint. *See id.* at *4.

The court acknowledged "Florida courts have not answered the question presented here, whether there is a duty to defend when the underlying complaint contains factual allegations of knowing, willful, and intentional acts but the causes of action alleged are not ones for intentional harms and can be proven without regard to knowledge or intent." *Id.* at *5. The court also recognized—as the instant case confirms—"[t]his scenario often arises in the context of Lanham Act claims where plaintiffs plead intentional conduct in order to obtain treble damages, but the plaintiff is not required to prove intentional conduct in order to recover actual damages." *Id.* (alteration added; citation omitted).

The court held the insurer was obligated to defend the insured, despite the allegations of intentional and knowing misconduct, because the insurer could be held liable in the underlying suit even if the plaintiff in that suit did not prove its allegations of intent and knowledge. *See id.* at *5, 9. In so holding, the court explained why its approach was correct under Florida law:

> There cannot be a duty to indemnify without a duty to defend. The [opposite] approach ... provides the possibility that an insurer would have to indemnify its insured for covered damages without the insurer ever having to provide a defense to its insured. This standard produces a result which is inconsistent and contrary to the fundamental premise of Florida law that the duty to defend is broader than the duty to indemnify. If this Court were to hold that the duty to defend is determined strictly by allegations that are unnecessary to a finding of liability, then it would have to ignore the actual causes of actions alleged, the elements necessary to sustain those causes of action, and the potential outcomes of a trial based on those alleged claims. With respect to the principle that the duty to defend is broader than the duty to indemnify, it is necessary for a court to consider both the allegations and the actual claims asserted in a complaint to determine potential policy coverage which could give rise to a duty to defend.

*Id.* at *9 (alterations added).

Defendant, in contrast, urges the court to follow *CareMedic Systems, Inc. v. Hartford Casualty Insurance Co.*, No. 8:06–CV–1185–T–30MSS, 2008 WL 912437 (M.D.Fla. Apr. 1, 2008), which can be read as taking a different tack. In that case, similar to this one, in light of allegations of willfulness and knowingly false statements, the insurer refused to defend its insured in an underlying suit "based on the [p]olicy's exclusions to the duty to defend for intent to injure and knowledge of falsity." *Id.* at *5 (alteration added). Unlike the instant case and *Orlando Nightclub*, however, the substantive claims in *CareMedic* were slander. *See id.* at *1.

Similar to Plaintiffs here and the insured in *Orlando Nightclub,* the insured in *CareMedic,* relying in part on *Orlando Nightclub,* argued it could be liable for defamation *per se* (one of the counts of the complaint) without proof of malice or falsity, and therefore the duty to defend was triggered. *See id.* at *6. The court rejected this argument as "unpersuasive" and found the insurer's duty to defend was not triggered. *Id.* at *6–7. The court's reasoning for dismissing the argument is not entirely clear, although it relied on *ABC Distributing, Inc. v. Lumbermens Mutual Insurance Co.,* 646 F.2d 207, 209 (5th Cir. Unit B 1981), in which the former Fifth Circuit, applying Florida law, found, "[even] if [the underlying plaintiff] could have gone to trial on a theory of unintentional [ ] violation ... the insurance company had a right to rely on the averments of the complaint that the [insured's] actions had been intentional." *CareMedic Sys.,* 2008 WL 912437, at *8 (quoting *ABC Distrib.,* 646 F.2d at 209) (alterations in original).

*ABC Distributing,* however, is distinguishable from the instant case, and thus Defendant's reliance on *CareMedic* fails to persuade. At first glance, the facts in *ABC Distributing* are similar to the facts both in this case and cases like *Orlando Nightclub and CareMedic.* The insured sought a defense from its insurer in an underlying suit in which it faced claims of trademark infringement. *See ABC Distrib.,* 646 F.2d at 208. The underlying complaint alleged the insured acted intentionally, which arguably triggered the same type of policy exclusion present in the instant case. *See id.* The insured contended the exclusion was not triggered because it could be held liable in the underlying suit even without proof of intent, but the Fifth Circuit rejected that argument on the "strict rule" in Florida law that "[t]he insurance company, in determining whether it has a duty to defend an action against its insured, may rely on the allegations of the complaint." *Id.* at 208–09 (alteration added).

The court read the underlying complaint as "replete with" allegations of intentional misconduct, and it further found the case did "not present a situation in which the insured, having been sued on one theory excluded by the policy, must defend at trial another theory arguably covered by the policy." *Id.* at 209. Yet, despite these findings, it is not apparent why the underlying complaint in *ABC Distributing* did not present such a situation—the court recognized in passing the general possibility of making a claim under the Lanham Act based on unintentional misconduct, but the court did not adequately explain why the underlying complaint foreclosed that possibility. As the Eleventh Circuit later explained in *Vector Products,* allegations of intentional misconduct allow a plaintiff to obtain treble damages under the Lanham Act, but a plaintiff nevertheless may recover actual damages under the Lanham Act absent proof of intent. *See* 397 F.3d at 1320 n. 2 (citing *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472 (11th Cir.1991)). The Court can only assume the underlying complaint in *ABC Distributing* unambiguously pleaded it sought relief exclusively on the theory of intentional misconduct.

This assumption is bolstered by an examination of the case law upon which the Fifth Circuit relied in reaching its decision. The main case, *National Union Fire Insurance Co. v. Lenox Liquors, Inc.,* 358 So.2d 533 (Fla.1977), was subsequently summarized and addressed by the Eleventh Circuit in *Vector Products* :

> In *Lenox Liquors,* the insurer refused to defend its insured, a liquor store, after the store's president shot and injured the underlying plaintiff during what the store president erroneously believed to

be a hold-up. [358 So.2d at 533. The underlying complaint only alleged claims sounding in intentional tort; however, the parties later reached a settlement in which they stipulated that it appeared from discovery that the case would have been tried on a negligence theory rather than an as an intentional tort case. *Id.* at 534. The Florida Supreme Court held that a duty to defend only arises "where the *complaint* alleges a state of facts within the coverage of the insurance policy." *Id.* at 535 (emphasis added).

397 F.3d at 1320 (alteration added).

The Eleventh Circuit in *Vector Products*, however, distinguished *Lenox Liquors*: "The cause of action stated in the *Lenox Liquors* complaint required an allegation of intent; the intent allegation in the case *sub judice* was superfluous on the issue of liability (though not for treble damages)." *Id. Lenox Liquors* and, by extension, *ABC Distributing* are distinguishable from the instant case for the same reason.[8]

■■■ Defendant's reliance on *CareMedic* thus fails to persuade. The Court finds *Orlando Nightclub*, which was predicated on more recent Florida law, as articulated in *Vector Products* and *Lime Tree Village Community Club Association, Inc. v. State Farm General Insurance Co.*, 980 F.2d 1402 (11th Cir.1993), much more persuasive. Accordingly, the Court adopts the approach used in *Orlando Nightclub*; under that logic, because the Exist Complaint sought actual damages for its copyright infringement claim and claims under Section 43(a) of the Lanham Act, the Knowing Violation Exclusion does not bar coverage.

In sum, Plaintiffs demonstrate coverage, and Defendant fails to prove an exclusion. Consequently, Defendant had a duty to defend Plaintiffs in the Exist Suit.

### E. Indemnification

A few scattered and general statements in Plaintiffs' Motion indicate Plaintiffs seek a declaratory judgment Defendant also has a duty to indemnify them with respect to liability incurred in the Exist Suit. (*See* Pls.' Mot. 1–2, 12). The duty to indemnify, however, is broader than the duty to defend, *see Farrer*, 809 So.2d at 88, and Plaintiffs do not develop any legal argument explaining why the duty to indemnify is triggered here, especially considering the Exist Suit settled. *See Power Corp.*, 2013 WL 4523490 at *3 n. 6. The Court therefore declines to declare Defendant has any duty to indemnify Plaintiffs, and thus grants Plaintiffs' Motion only in part—relief which Plaintiffs themselves acknowledge would be appropriate. (*See* Pls.' Mot. 12).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant's Motion [ECF No. 21] is **DENIED;** and Plaintiffs' Motion [ECF No. 30] is **GRANTED** in part. Defendant had a duty to defend Plaintiffs in the Exist Suit. A final judgment will be entered by separate order.

**DONE AND ORDERED** in Miami, Florida, this 14th day of October, 2015.

---

8. The other cases upon which the Fifth Circuit relied, *Capoferri v. Allstate Insurance Co.*, 322 So.2d 625 (Fla. 3d DCA 1975), and *Federal Insurance Co. v. Applestein*, 377 So.2d 229 (Fla. 3d DCA 1979), are similarly distinguishable.